## CAHOON v. COE.

Upon chapter 47 of the Revised Statutes, a sheriff's sale of Wentworth's Location, an unincorporated place, for non-payment of a State tax, *held* valid, under the following circumstances: The act of the legislature, by which the tax was voted, was passed July 3, 1847: the advertisement of sale described the tax as a State tax for the year 1848. By the act, the tax was made payable on or before December 1, 1848: the sheriff's deed described the tax as by said act made payable on or before January 1, 1850. The treasurer's warrant was for the collection of three dollars tax and one dollar for the warrant: in the advertisement the tax was stated to be "300," the warrant "100," and the total "400." The sale was made after the return day of the warrant. No advertisement was posted in the location. The location was inhabited. The jury found, under certain instructions, that there was no public place in the location. The number of acres of land taxed was not stated in the treasurer's warrant. The warrant was not deposited with the clerk of court. The copy of the list of taxes, delivered by the sheriff to the deputy secretary, did not show that the treasurer's warrant was under seal (as in fact it was), and contained in the date "April," which was not in the original.

WRIT OF ENTRY, by George W. Cahoon and Mary L. Cahoon, his wife, against Ebenezer S. Coe, to recover the grant of land called Wentworth's Location. Plea, *nul disseizin*. In order to show title in said Mary, the plaintiffs' counsel read the act of the legislature of New Hampshire, approved July 3, 1847, entitled "An act to raise $60,000 for the use of the State." They then read copies of certain papers deposited by Charles Bellows, sheriff of the county of Coös, in the office of the clerk of the court of common pleas February 2, 1850, which copies were certified by the clerk. One of the papers thus deposited by said Bellows purported to be a copy of the warrant issued by John Atwood, treasurer of the State, to said Bellows as sheriff, of which the following is a literal copy:

"TREASURY OFFICE, STATE OF NEW HAMPSHIRE.
"JOHN ATWOOD, Treasurer of said State, to the sheriff of the county of Coös, greeting: Whereas, by an act of the legislature of said State, passed July 3d, 1847, and entitled 'An act to raise sixty thousand dollars for the use of the State,' it is provided that the sum of sixty thousand dollars shall be raised for the use of the State, to be assessed, collected, and paid into the treasury, on or before the first day of December, A. D. 1848;—and whereas, the proportion of Wentworth's Location (a place unincorporated, having so few inhabitants as to be incapable of choosing town officers) of said sum of sixty thousand dollars is three dollars, which sum of three dollars has been assessed upon and proportioned to said Wentworth's Location, according to

law : now, by virtue of the provisions of the Revised Statutes, passed December 23, 1842, providing for the collection of taxes by the sheriff, you are hereby, in the name of the State of New Hampshire, empowered to collect said sum of three dollars, being the proportion of Wentworth's Location as aforesaid, according to the provisions of said Revised Statutes, with one dollar for this writ, and cause the same to be paid and satisfied to the treasurer of said State for the time being.'

$3.00
1.00
——
$4.00

" Hereof fail not, and make due return of this warrant, with your doings therein, unto the treasurer of said State for the time being, by the first day of January, 1850. Given under my hand and seal at Concord, the twenty-fifth day of April, Anno Domini 1849.

" JOHN ATWOOD, Treasurer.

"A true copy. Attest:        CHAS. BELLOWS, Sheriff."

On the back of said copy are the following indorsements :

" Rec'd June 8, 1849.        W. C. PRESCOTT, Dep. Sec'y.

" Rec'd from deputy secretary, Sept. 15, A. D. 1849. Attest:

"CHAS. BELLOWS, Sheriff."

Said copy was the same in fact sent to the deputy secretary, and by him returned t' ·aid Bellows.

The plaintiffs' counsel also read the act of apportionment, approved Dec. 26, 1844, by which it appears that the proportion of said Wentworth's Location for every thousand dollars assessed for State taxes was five cents.

It also appeared that an advertisement, literally as follows, was published in the *Coös County Democrat*, printed at Lancaster in said county, dated respectively Nov. 7, Nov. 14, and Nov. 21, 1849, and in the New Hampshire *Patriot and State Gazette*, printed at Concord, and dated respectively Oct. 18 and Oct. 25, 1849 :

" State of New Hampshire, Coös ss. :   Public notice is hereby given to the proprietors and owners of lands in the following townships, locations, and grants in the county of Coös, that so much of said townships, locations, and grants will be sold at public auction, at the Coös hotel in Lancaster, on Tuesday, the 29th day of January next, at 10 o'clock A. M., as will satisfy the several warrants issued against said townships, locations, and grants by the treasurer of the State for the following State taxes for the year A. D. 1848, and incidental charges, unless prevented by previous payment:

|  | Tax. | Warrant. | Total. |
|---|---|---|---|
| Wentworth's Location, . . . . . . . . . . | 300 | 100 | 400 |
| Low and Burbank's Grant, ¼ paid by Seth Mason, ¼ paid by J. Bellows, ¼ paid by N. L. Woodbury, leaving one fourth unpaid on . . . . | 150 | 100 | 250 |

"CHAS. BELLOWS, Sheriff.

" Northumberland, Oct. 1, A. D. 1849."

A notice precisely like the foregoing was posted by said Charles Bellows, sheriff, at the inn of Joseph C. Cady, in said Lancaster, on November 16, 1849, and remained so posted until the day of sale. By

the return of said sheriff, it appeared that said Wentworth's Location was sold, in pursuance of said advertisement and notice, on said January 29, 1850, to John Bellows. On February 1, 1851, said Charles Bellows, as sheriff, executed to said John Bellows a deed of said Wentworth's Location, which recites the fact of said sale as follows:

"The said John Bellows, being the legal bidder and purchaser of the same, at a public vendue, legally notified and holden at the Coös hotel in Lancaster, in said county of Coös, on the 29th day of January, A. D. 1850, for the collection of non-resident taxes, raised by an act of the legislature of said State, passed July 3d, A. D. 1847, and by said act made payable into the treasury of said State on or before the first day of January, A. D. 1850."

The plaintiffs put in evidence the original state treasurer's warrant, of which the before recited copy is a true copy, except that in the original the date is in the words and figures following: "Given under my hand and seal at Concord, the twenty-fifth day of      Anno Domini 1849;" and following the word "treasurer," after the signature, was a paper seal, wafered upon said warrant. The plaintiffs also produced two other warrants, issued by said Atwood upon said tax of July 3, 1847,—one against Low and Burbank's Grant, and one against Bean's Purchase, both dated April 25, 1849; and, also, a letter from said Atwood, of the same date, to said Charles Bellows, the said three warrants being inclosed in said letter; and it appeared in evidence that said Charles Bellows received said letter and said three warrants prior to May 1, 1849. It also appeared that said original warrant was never filed in the office of the clerk of said court. It was admitted that said sheriff posted no advertisement or notice of said sale at any place in said Wentworth's Location. It appeared in evidence that, for two or three years prior to and up to the time of said sale, there had been from five to eight families residing in different houses, upon the Magalloway river, in the easterly part of the location, upon farms which they occupied and claimed to own. These families resided in small, ordinary dwelling-houses, of cheap construction, scattered on each side of the Magalloway river, and all located within a circuit of four or five miles. There was, within the limits of the location, no church or meeting-house, school-house, hotel, office, mechanic's shop, store, sign-post, guide-post, or board, box by the wayside for depositing newspapers for subscribers or others, no public highway or bridge, nor any other place save mere dwelling-houses, at which a notice of said sale might have been posted; and no person had ever known a notice or advertisement of any kind to have been posted in the location prior to the date of said sale. There was a settlement at a place in Maine called "Wilson's Mills," about eight miles distant, up the Magalloway, from the settlements in the location. The evidence upon both sides tended to show that occasionally one or more of the inhabitants of the settlement called Wilson's Mills, or the lumbermen employed in the regions round about, or an occasional huntsman or fisherman, passed through Wentworth's Location, sometimes stopping at one of the houses

in the settlement for lodging or refreshment. The defendant's testimony tended to show (and for the purposes of this case, only, it was conceded) that, at the date of said sale, the original title to said location was in the heirs of one David S. Greenough, two of whom lived in Massachusetts, and one in North Carolina; and that John M. Wilson, the agent for said Greenough heirs, and looking after their interests, resided at said Wilson's Mills. The defendant introduced deeds of conveyance and other evidence for the purpose of showing title to said location, under a grant from the State made to George Wentworth, in 1796, to which, for the purposes of this case, only, no objection is suggested by the plaintiffs.

The defendant stated and relied upon the following objections to the plaintiffs' title:

1. The advertisement of sale, published and posted as aforesaid, does not correctly describe the tax: it describes it as the tax of 1848, when it should have described it as the tax assessed by an act of the legislature of July 3, 1847. 2. The advertisement does not describe the amount of the tax in an intelligible manner, nor as the same is described 'in the warrant. In the advertisement there is no dollar mark or other think to indicate what the figures were intended to express. 3. The sale was not made till after the return day of the warrant. 4. Wentworth's Location was an inhabited place, and no advertisement or notice of the sale was posted in said location. 5. The number of acres upon which the tax was assessed is not contained or indicated in the list of the tax upon which the sale was made. 6. The copy of the State treasurer's warrant, which was filed in the office of the clerk of the court by the sheriff in his return of his sale, has no evidence upon it that there was a seal upon the original,—that is, there is no L. S. or scroll to show the place of the seal; and the same is true of the copy sent to the deputy secretary,—the paper sent to said deputy secretary being the same subsequently filed with the clerk. 7. The sheriff, in making his return of the sale to the clerk of the court, did not file the original warrant, which is the original tax-list upon which the sale was made. 8. The deed of the sheriff to John Bellows misdescribes the act assessing the tax upon which the sale purports to have been made. By the act, the tax is made payable into the State treasury on or before December 1, 1848. The deed describes the act as making the tax payable into the State treasury on or before January 1, 1850. The deed does not correspond with the advertisement in its statement of the tax upon which said sale was made. 9. The copy of the warrant sent by the sheriff to the deputy secretary of State is not a true copy of the original warrant, in this, that there is no name of the month in the date of the original, but the copy has the month "April" in the date. There is a seal on the original, but no evidence of a seal on the copy. The court, *pro forma*, overruled all said objections.

The defendant requested the court to instruct the jury that, inasmuch as it appears that there was a settlement in Wentworth's Location, consisting of several families of inhabitants, residing in said

location in October, November, and December, 1849, and January, 1850, it was necessary that the sheriff of the county of Coös should have posted an advertisement of this sale in question at some place in said location ; which request the court denied.

The defendant then requested the court as follows: " On the evidence of the plaintiffs, it appears that in 1849 there were several places in Wentworth's Location so public that an advertisement, if posted at any one of them, would have been seen by many persons, and especially by the residents of the place. The defendant, therefore, requests the court to order a verdict for the defendant." This request the court also denied.

The plaintiffs' counsel requested the court to charge the jury that an ordinary private dwelling-house, used for the purposes for which such dwelling-houses are commonly used, is not a public place ; and if there were none but such existing upon Wentworth's Location in October, November, and December, 1849, and January, 1850, then no notice of this sale was required to be posted there. This request was also denied.

The court instructed the jury as follows: " The law requires, in order to the validity of a sale for public taxes, that an advertisement, containing certain prescribed information, shall be posted at some public place in the towns where the lands lie, at least eight weeks before the sale. It is admitted that no notice of this sale was posted in Wentworth's Location, the town where the lands were. But if there was no *public place*, within the meaning of the law, in Wentworth's Location, during the whole period of eight weeks together, prior and up to January 29, 1850, no posting of notice in the location would be required, and, so far as that is concerned, the sale would be valid without such notice. The question to be determined by your assistance (it being a mixed question of law and fact) is, whether or not there was within the territorial limits of Wentworth's Location a *public place*, during all the time commencing eight weeks prior to January 29, 1850. What, then, is a *public place*, within the meaning of the law ? Practically, a public place is supposed to mean a tavern, store, workshop, or other place where people are in the habit of resorting for the transaction of business. In thinly settled places, where there is no tavern, house of public worship, school-house, mechanic's shop, post-office, or other place where people are in the habit of resorting for the transaction of business, a bridge, guide-board, or post-box by the wayside where newspapers are left for subscribers or others, may be regarded as a public place, where no more public place can be found, because these are places to which people are in the habit of resorting for the transaction of such business as such places are designed to facilitate, and where a notice posted would be likely to meet public view and attract observation. Where there is no *other place than a dwelling-house* which *can* be considered a public place, whether a dwelling-house *is* a public place depends upon various considerations : 1. The nature and situation of the house, and the uses to which it is applied. To

constitute a dwelling-house a public place, it is not necessary that it should be a recognized tavern or inn ; but if it be a place of ordinary, usual, or frequent resort by the travelling or other public, for lodging, entertainment, or other business, it is a public place, whether the lodging or other entertainment be paid for, or furnished gratuitously.   But a merely casual or accidental resort to or accommodation of one or more individuals at the house would not make it a public place.   2.  In the case of one or more dwelling-houses, all situated similarly in the respects above alluded to, all or either may or may not be a public place, according to the nature and situation of the place, and the uses to which it is applied.   In such case, the law does nôt require a posting of the notice at the *most* public place ; but, in cases where there are no places of more public resort than ordinary dwelling-houses, the term public place must be construed to mean such place as, in comparison with other places in the same town, are the places where the inhabitants and others most frequently meet or resort, or have occasion to be.   In view of all these considerations, you are to find, by your verdict, whether or not there was, during all the period of eight weeks immediately preceding January 29, 1850, a public place in Wentworth's Location."

And the court directed the jury to return special answers to the following questions :   1.  Was there, during all the period of time alluded to, a post-office in Wentworth's Location ?   2.  Was there, during all the same time, a place of ordinary, usual, or frequent resort, by the travelling or other public, whether people from abroad or settlers in the location, for lodging, entertainment, or other business ?   3.  Were the dwelling-houses in Wentworth's Location similar in the respects alluded to ?   4.  Was any one dwelling-house more frequently resorted to than another, by people not residing permanently in such dwelling-house ?   5.  Was there any dwelling-house in Wentworth's Location, which, in comparison with the other dwelling-houses, was the place where the inhabitants or others most frequently met, resorted, or had occasion to be ?   6.  Was there, during all the period alluded to, a *public place* in Wentworth's Location ?   To these instructions the defendant excepted.

The jury, by special verdict, answered the first, second, fourth, fifth, and sixth questions in the negative, and the third question in the affirmative.   Whereupon the court directed a general verdict for the plaintiffs ; the defendant excepted, and a case was reserved.

*Fletcher & Heywood* and *Burns & Heywood*, for the defendant.

*G. A. Bingham* and *Ray*, for the plaintiffs.

* DOE, J.   I.  The warrant of the state treasurer empowered the sheriff to collect $3 tax, the proportion of Wentworth's Location,

---

* BELLOWS, C J., did not sit.

under the act of 1847 raising $60,000 to be assessed, collected, and paid into the treasury on or before December 1, 1848. In the advertisement the tax was described as the State tax "for the year A. D. 1848." The. law did not expressly describe the tax as of any particular year, and there is. no absolute rule requiring it to be called by the name of the year. of the act of the legislature authorizing it, or by the name of the year in which it is expected to be paid. Ordinarily it would seem to be safe to name a tax as of the year in which it is understood to be payable, although it might not be a misnomer to name it of the year when it is voted. The law has not expressly fixed the nomenclature on this point, and we see no reason for establishing an arbitrary rule by construction. What is wanted is a description practically sufficient for the information of the taxpayer and all parties interested in the tax. Describing it as of the year when it is due, seems not likely to mislead any one, and to be unobjectionable.

II. The statute required the advertisement to contain the amount of tax which is inserted in the collector's list. The amount inserted in his list was $3 tax, and $1 for the warrant. In the advertisement the tax was stated to be 300, the warrant 100, and the total 400, without any special mark, punctuation, separation, or sign, to show that the figures were intended.to represent money, or one kind or denomination of anything rather than another. Such a statement of the amount of tax in the advertisement, if it is defective, cannot be eked out by a presumption that the taxpayer knows that a tax described as a State tax for the year 1848 is part of $60,000 voted by the legislature in 1847, and that, of every $1,000, the proportion of Wentworth's Location is a certain sum fixed by the general law. Most people would naturally suppose that the cost of the warrant was more likely to be $1 than $100 ; but it is doubtful if the taxpayer should be compelled to supplement the information which the advertisement should give him of the amount of tax, by a supposition of that kind. He must be presumed to understand that, in the connection in which the figures occur, they mean money, and the ordinary currency of the country ; but whether they must be understood to mean one denomination or another of that currency, or whether they indicate no denomination at all, and are therefore uncertain and insufficient, is not so clear.

There are cases in which, in the absence of evidence as to the amount or value of property, it is fair to find, by a presumption of fact, that the property is of the largest quantity or best quality, as against a party who conceals the property, or, having means of proving its amount or value, withholds the evidence, or is in.fault for not having made it certain, and obtained and retained evidence of it when it was in his power to do so. *Bailey* v. *Shaw*, 24 N. H. 297, 301 ; *Ladd* v. *Harvey*, 27 N. H. 372, 381. But such cases present no rule of law ; they are merely cases where the tribunal, trying a question of fact, finds a fact by a natural inference or presumption from the absence of evidence which a certain party ought under the circumstances to produce. Possibly there may be cases of contract in which a written agreement by con-

struction, or a parol agreement by presumed intent of the parties, may be held to mean the lowest number, or smallest quantity, or poorest quality, rather than defeat the entire contract for uncertainty. But the question in this case is not of the weight of that evidence which consists of the significant absence of evidence which a party could have produced, nor of the construction or intent of a contract, nor of good pleading. It is a question of the sufficiency of the information given in a notice required by statute. Did the notice give the information of the amount of tax required by the statute? Are 300, 100, and 400, when read with the context, the same as $3, $1, and $4? What would the taxpayer understand the amounts to be if he saw the notice? It has been held in Illinois and California that the statement of a tax, in figures alone, with no special *indicia* of denomination, is fatally defective. *Lawrence* v. *Fast*, 20 Ill. 338; *Lane* v. *Bommelmann*, 21 Ill. 147; *Eppinger* v. *Kirby*, 23 Ill. 523; *Dukes* v. *Rowley*, 24 Ill. 210; *Cook* v. *Norton*, 43 Ill. 391; *Woods* v. *Freeman*, 1 Wall. 398; *People* v. *S. F. Savings Union*, 31 Cal. 132; *Braby* v. *Seaman*, 30 Cal. 610, 619. In *Lawrence* v. *Fast*, BREESE, J., delivered a dissenting opinion in which we concur. We are satisfied that the figures, taken in the connection in which they stand, must be understood to mean dollars or cents, or dollars and cents, the ordinary denominations of our money; and we incline to the opinion (though by no means free from doubt) that, there being nothing to indicate dollars, the figures may be understood to signify cents, the lowest denomination of our currency in common use. Upon this construction, the advertisement is sufficient.

III. The objection that the sale was made after the return day of the warrant, cannot prevail. *Homer* v. *Cilley*, 14 N. H. 85, 99; *Wells* v. *Burbank*, 17 N. H. 393; *Smith* v. *Messer*, 17 N. H. 420.

IV. The statute requires the advertisement of sale to be posted up at some public place in the town where the lands lie. Rev. Stats., ch. 46, sec. 7. No advertisement was posted in the location. The jury have found that, applying all the tests of a public place given them in the instructions, there was no public place in the location. If the whole question, What constitutes a public place for the purpose of notice? were a new one, there might be good reason to give it a more careful examination than it has yet received in this State, and to consider whether the true construction of the statute is not that notice should be posted in the town, inhabited or uninhabited, travelled or untravelled; whether the notice should not be posted in one of the most public places, in a place as public as any, or in a place where it would be as likely to be seen as in any; whether the word " public," used to describe a place of notice, is arbitrary and technical, or whether it requires that notice should not be posted at a place in the town where it would be materially less likely to be seen by such persons as might happen to be in or to go into the town, than at some other place in the same town; whether the statute does not imperatively require notice to be posted in the town, and whether the chief object of the word " public" was not to prevent an intentional or negligent conceal-

ment of the notice, by posting it at a place not public as compared with other places in the town; whether the word means anything more than a place relatively and comparatively public, and, at all events, not essentially and peculiarly less public than other places in the same town, if there is no place of common resort. Very strong reasons might be given for such a construction. But the general question is not an open one *( Wells* v. *Company*, 47 N. H. 235, 255); and the manner in which the settled construction was applied at the trial of this case the defendant cannot complain of. If the construction given to the statute from 1825 *( Tidd* v. *Smith*, 3 N. H. 178) to the present time is erroneous, the introduction of the true construction, and the retrospective application of it, might now unsettle titles and disturb vested rights that have grown out of the established construction. In some cases, where people, acting on the faith of what has been declared to be the law, have been induced to change their position, retrospective decision is as distinctly prohibited by the common law (carrying out the doctrine of natural justice called equitable estoppel) as retrospective legislation is by the constitution, which, in this respect as in many others, is but a reënactment of a very ancient principle. In such cases, when a change is necessary, it should be made applicable to future cases by the legislature.

V. Chapter 47 of the Revised Statutes does not require the number of acres of an unincorporated place, taxed by the state treasurer, to be stated in the warrant by him committed to the sheriff for the collection of the tax.

VI. The sheriff could not invalidate his sale by subsequently neglecting to leave his papers with the clerk of court. Authorities cited in *Wells* v. *Company*, 47 N. H. 235, 258.

VII. The mistake in the sheriff's deed, referring to the tax as payable on or before January 1, 1850, when by the act it was payable on or before December 1, 1848, is immaterial. The description of the land and the sheriff's authority are sufficiently plain. The mistake leaves no doubt of what he undertook to convey, or by what authority.

VIII. The warrant of the State treasurer was under seal, as required by law (Rev. Stats., ch. 47, sec. 3); but the copy of it sent by the sheriff to the deputy secretary (Rev. Stats., ch. 47, sec. 4; ch. 46, sec. 2) had no seal, nor any mark or sign of one. The original had no month in its date; the copy had "April" in its date. Was the paper, purporting to be a copy, a sufficient copy within the meaning of the statute, notwithstanding these variances? The " treasurer shall assess the tax " and " commit such tax to the sheriff," " with a warrant under his hand and seal to collect the same," and the " sheriff shall proceed in the same manner" as collectors of taxes of non-residents " are by law bound to do." Rev. Stats., ch. 47, secs. 1, 3, 4. Selectmen are required to make " a list of the taxes" of non-residents, " under their hands;" "such list shall be delivered to the collector," "and the collector shall" "deliver a certified copy of his list to the deputy secretary ; " and " the deputy secretary shall keep such copy at Concord "

" for the inspection of all concerned, and shall receive the tax." The object of the statute, in requiring the deputy secretary to have a copy " for the inspection of all concerned," and to receive the tax, is, to give non-residents an opportunity to pay their taxes at Concord (which may be a more convenient place than the town in which the land lies), and to give them some information when they undertake to make payment there. What information did the legislature intend they should obtain from the copy ? We see no design to provide any other for them than such information concerning the tract of land taxed and the amount of the tax, that they may know what land is taxed, and what the tax is. The copy of the list of non-resident taxes is required to convey no information except that such taxes of certain amounts have been assessed on certain lands (with the name of the owner or original owner, if known), authenticated by the certificate or attestation of the collector as being copied from the original list made by the selectmen " under their hands," but not necessarily under seal. There is nothing in the statute indicating that the subsequent sale of land for nonpayment of tax is to be void, by reason of any clerical mistake in the copy not affecting the information which the taxpayer is entitled to find in it. If the original is dated April 20, and the copy represents it as dated April 21, we see no reason to suppose the legislature intended the sale should be void, any more than for the misspelling of words where the sense is clear. And if the name of the month is omitted in the date of the original, and April inserted in the copy, the object of giving the taxpayer information of the identity of the land taxed and the amount of the tax being accomplished, the statute, construed by its manifest general purpose (the office of construction being to ascertain the intent of the legislature), does not invalidate the sale for such an immaterial variance.

The statute requires, not that the sheriff shall deliver a copy of his sealed warrant to the deputy secretary, but that he shall proceed in the same manner as a collector of non-resident taxes is by law bound to do ; and such collector is by law bound to deliver to the deputy secretary a certified copy of the list of non-resident taxes, made by the selectmen " under their hands," and delivered to him. When a proper list of taxes assessed upon an unincorporated place is inserted in the treasurer's warrant, the warrant is a sufficient list. *Wells* v. *Company*, 47 N. H. 235, 256. But the statute does not require that the copy of the list of taxes delivered to the deputy secretary by the sheriff shall contain a copy of the seal of the warrant authorizing him to collect the taxes, or a copy of anything except what a list of non-resident taxes is required to contain. It is a copy of the list of taxes,—a copy of a paper containing what a list of taxes is required to contain,—that is to be delivered to the deputy secretary for the inspection and information of all concerned ; and when the list is contained in a warrant, a copy of the warrant, so far as it is a list, is a copy of the list, within the evident object and meaning of the statute. So far as the warrant is more than a list,—so far as it contains more than a list (of taxes

assessed upon an unincorporated place) need contain,—the statute does not require a copy of it to be delivered to the deputy secretary. The intention of the legislature was to give the taxpayer an opportunity to obtain information of those things which the list should contain, to enable him to ascertain what land was taxed, and what the tax was. If he sees in the copy any evidence of a defect in the original not affecting the points as to which he is entitled to find information in the copy, but touching the assessment or proceedings on other points, and is thereby put upon inquiry to ascertain whether the defect exists, he has all the advantage which it can be presumed the legislature intended he should have. If he might rely upon the copy as conclusive evidence of defects in the original not affecting such information, the collection of such taxes would be burdened with unreasonable formalities, and titles of real estate destroyed by defects of which the purchaser could not be expected to be aware.                    *Judgment on the verdict.*